**Irma D. LARISCY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 86–1174.

United States District Court, District of Columbia.

March 5, 1987.

Mark J. Brice, Koonz, McKenney & Johnson, Washington, D.C., for plaintiff.

James N. Owens, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff Irma D. Lariscy has brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1986), for personal injuries that stem from an automobile accident on March 13, 1985. She claims permanent injuries and seeks $3 million in damages. Trial was held before

the Court on December 15 and 16, 1986. After reviewing the evidence, the Court finds that plaintiff has proved that her injuries resulted from the negligent driving of defendant's agent. Judgment will be entered in favor of plaintiff in the amount of $49,326.

## I

The evidence in this case revealed the following series of events. On March 13, 1985, at approximately 2:30 p.m., plaintiff was driving her car south on Vermont Avenue, N.W., in Washington, D.C.[1] She was heading for the K Street intersection. Plaintiff signaled for a left turn and checked to see that all traffic approaching from the south was lined up to turn left, westbound onto K Street. She began to make her own left turn, eastbound onto K Street.

At the same time, Michael G. Camp was driving a stationwagon owned by the Drug Enforcement Administration. Mr. Camp was driving the vehicle in the course and scope of his employment.[2] He headed north on 15th Street toward K Street, intending to continue up Vermont Avenue. According to the testimony of Christopher Bach, an uninvolved eyewitness,[3] Mr. Camp was driving directly toward the line of cars that were waiting to turn left onto K Street, when he swerved to the right in order to pass them. Officer Frank Strother of the Metropolitan Police Department, the accident investigator who arrived at the scene shortly after the accident, testified that 15th Street has only one lane in each direction, so that Mr. Camp was "making an extra lane" for himself. Moreover, Mr. Bach testified that Mr. Camp was driving "at a rapid speed," about 30 to 35 miles per

hour—a speed consistent with Officer Strother's measure of four feet of post-crash skid marks.[4] By this time, plaintiff had begun her turn and was crossing the intersection. The front end of the DEA vehicle crashed into plaintiff's right front fender and passenger door. Another uninvolved eyewitness, Wendell Ellerbe, testified that "there was nothing [plaintiff] could do" to avoid the accident.[5]

## II

The determination of liability in this case is not difficult. Defendant's uncontroverted failure to obey the speed limit and sudden swerving into his own "lane" are clear evidence of negligence. *See* D.C. Mun.Regs. §§ 18–2200.5–.6, –2201.8(a), –2208.6 (1981). The only substantial question on liability is whether plaintiff was contributorily negligent.

In order for plaintiff's claim to be barred by contributorily negligence, defendant must prove by a preponderance of the evidence that plaintiff breached her common law duty to drive in a reasonable safe manner or inexplicably violated a traffic regulation. *See Richardson v. Gregory*, 281 F.2d 626 (D.C.Cir.1960). Defendant has failed to do this.

The right of way in this situation is covered by D.C.Mun.Reg. § 2208.6. That section provides:

[t]he driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close as to constitute an immediate hazard; provided, that after a driver has so yielded and has given a signal, as re-

---

1. Vermont Avenue merges into 15th Street as it crosses south of K Street; traffic heading north on 15th Street either turns on K Street or continues on Vermont Avenue.

2. Mr. Camp is since deceased, not as a result of this accident. He had not been deposed.

3. Mr. Bach, an employee of the Department of Commerce, was returning from lunch and standing on the southwest corner of K and 15th Streets, waiting to cross 15th Street. He had a

clear view of the accident and testified with a good recollection of events.

4. The unposted speed limit for thee streets is 25 miles per hour, according to the testimony of Officer Strother.

5. Mr. Ellerbe, driving his cab, was waiting at a red light, in the curb lane of K Street, heading west. He also testified that Mr. Camp was looking west toward a park, instead of looking at the road.

quired by this chapter, the driver may make the left turn and the drivers of all other vehicles approaching the intersection from the opposite direction shall yield the right-of-way to the vehicle making the left turn.

It is clear from the testimony, however, that when plaintiff began her turn, defendant's vehicle was neither "in the intersection" nor "so close as to constitute an immediate hazard." In fact, defendant's vehicle was hidden behind a line of left-turning cars until he swerved into the intersection at a high rate of speed. Plaintiff had checked the intersection, found it empty, signaled, and began her turn. According to Officer Strother, she violated no traffic regulations. Given these facts, defendant has not met its burden in showing that plaintiff was contributorily negligent.[6] *See Frager v. Pecot*, 327 A.2d 306 (D.C. App.1974). Consequently, the Court concludes that defendant is liable for all damages proximately caused by this accident.

### III

The much more difficult question in this case is the appropriate award of damages. Plaintiff, who worked as a "comparison shopper" for Dart Drug and also operated her own video game business, alleges that as a result of this accident she has suffered a complete loss of earnings and earning capacity—that is, that she will never be able to work again, although she is now only 31 years old. Plaintiff also seeks to recover for past and future medical expenses, as well as damages for pain and suffering. Her purported injuries include relentless headaches;. shoulder and neck pain; increasing parathesias and weakness in her upper extremeties; nerve damage; and depression and emotional anxiety. She claims that these conditions will require the continued treatment of a neurosurgeon and psychiatrist, and perhaps neurosurgery. She claims that these injuries are permanent.

These claims are made much more difficult to evaluate by the fact that plaintiff suffered similar injuries when she was hit by a truck in 1979. After that accident, she underwent surgery to remove some cervical bone, and underwent treatment by a neurosurgeon through 1982.[7] This neurosurgeon, Dr. Sharon Marselas, testified that plaintiff had "considerable residual impairment" of her right arm after the first surgery—before the instant accident—and would experience pain and numbness that could not improve. Dr. Marselas testified that plaintiff's right arm showed a large degree of prior abnormality that "may have been" aggravated by this event. In fact, Dr. Marselas' records of October 27, 1982 already document chronic *and increasing* nerve damage, as well as right arm and hand problems. Those same records already reflect that, at least in Dr. Marselas' or plaintiff's opinion, plaintiff already had to give up her business.[8]

This is by no means to say that plaintiff was not injured by this second accident. Although she received no medical care on the day of the accident, and in fact stood at the crash site for some three hours, plaintiff testified that she soon suffered from body aches. She first sought treatment the next day, from the Kaiser-Georgetown Health Plan, where she underwent x-rays and was ordered to rest in bed and receive physical therapy for a few weeks. Her diagnosis was cervical strain. One month later, now experiencing problems with her neck, back, and both arms, plaintiff returned to Dr. Marcelas. Dr. Marcelas hospitalized plaintiff for a few days and placed her in light traction. Six months later,

---

**6.** There was some testimony from Mr. Ellerbe that plaintiff's car was standing still in the intersection when the accident occurred. But this testimony was contradicted by Mr. Bach, who displayed a clearer recollection of the incident. Moreover, even if plaintiff's car had been stopped momentarily, this would not satisfy defendant's burden of proving contributory negligence. The fact may only show that plaintiff suddenly saw Mr. Camp swerve into the intersection and tried to keep from hitting him as he headed for the front end of the car. Under the circumstances, such a reaction would be eminently reasonable.

**7.** Plaintiff briefly saw the neurosurgeon again in 1984.

**8.** In fact, plaintiff later returned to full-time employment.

plaintiff was again hospitalized for tests and for nerve block treatments. She has since received occasional nerve blocks, which alleviate her pain for a week or two.

According to Dr. Marcelas, plaintiff is demonstrating a fair degree of "subjective" symptoms—symptoms that cannot be documented. For example, she reports "subjective numbness" and "subjective sometimes observable" loss of arm use. Moreover, she reports a great degree of pain, which of course cannot be measured objectively. Plaintiff herself reports cramping problems with her right hand, making it difficult to hold objects. Her hand, she testified, quivers uncontrollably. She can hardly write and cannot drive. She cannot do housework, and in fact claims to be confined to her bed for most of the day. She has severe headaches. She has suffered severe depression for which she has recently seen a psychiatrist, and which she claims led to her separation from her husband.

Meanwhile, Dr. Marcelas testified that plaintiff's *objective* symptoms are spasms and limited neck mobility, along with previous right arm damage that "may have been" aggravated by this event. Dr. Marselas believes that plaintiff is suffering from cervical strain, or perhaps from a derangement of the cervical disc that somehow does not show up on two myelograms. Dr. Elliott Wilner, a neurologist who testified as an expert for the defendant, stated that there is only the "most remote" possibility that these myelograms would fail to reveal such a condition. Moreover, Dr. Wilner testified that further testing may have determined plaintiff's condition more accurately, but that plaintiff did not allow such tests, presumably because they would have been painful. Finally, Dr. Wilner did testify that, to a reasonable degree of medical certainty, plaintiff is suffering from a "neurological lesion" that arose from the instant accident.

At the time of the injury, plaintiff's main employment was as a comparison shopper for Dart Drug. It was her job to drive to competing stores, record prices of various items, and submit a weekly report. She had retained this job for eight months until the accident. Her salary was $12,480 per year at the time of the accident, for forty hours of weekly work. Plaintiff testified that Dart Drug fired her after the accident, but it should be noted that company records indicate the firing resulted from her failure to submit post-accident forms and not her inability to work. (Plaintiff in fact does not recall submitting a doctor's certificate.) Plaintiff has not since returned to work, and claims that her inability to drive and write prevents her from obtaining a comparable job. Meanwhile, plaintiff testified that with help, she has been conducting her video business, which basically consists of checking and retrieving money from video machines around the area. She has sold a half interest in the business and intends to sell the rest, presumably for fair compensation.

This rather long discussion should make it clear that determining fair compensation for plaintiff's injuries is no easy matter. Her pain almost certainly exists, but it is impossible to gauge its extent. It is far from clear to what extent the injuries to her right arm stem from her previous accident. It is impossible to determine the causal connection between the accident, the separation from her husband, and her depression. If plaintiff cannot hold objects, if plaintiff trembles uncontrollably, these facts were not evident in the courtroom, but they may well trouble plaintiff at other times and places.

Dr. Richard Lurito, an expert economist, testified that plaintiff would lose various amounts of money if she could not work at all, or work only at half-time or half-wages, for the remainder of her life. But despite her inability to drive and great difficulty in writing, there is no reason to believe why plaintiff cannot obtain a new job that pays $12,480 per year, or $6 per hour. She may experience headaches, but headaches do not prevent untold numbers of people from working when they must. Consequently, the Court will not award plaintiff damages for lost future earnings. As to past lost wages, plaintiff's claim of ninety-three weeks of lost work from this

injury is vastly exaggerated, particularly since the loss of plaintiff's job was at least in part her fault. Instead, the Court will award twenty-six weeks of past lost wages at $240 per week, for a total of $6,240.

■ Plaintiff's claim of $70,805 in lost household services is even more out of the realm of realism, since it is once again based on disablement for the rest of plaintiff's lifetime. Instead, the Court will award fifty-two weeks of lost household services at $25 per week, for a total of $1,300. Plaintiff's claim of lost health insurance benefits will be reduced from $19,-184 to $1,000; presumably, she will regain group health benefits when she obtains new employment. Plaintiff's past medical expenses will be awarded in full—$10,786. Finally, the Court will award plaintiff $30,-000 for pain and suffering.